Joseph A. D'AMBRA and Constance
C. D'Ambra

v.

UNITED STATES of America.

Civ. A. No. 4619.

United States District Court,
D. Rhode Island.

Aug. 8, 1973.

As Amended Aug. 9, 1973.

Girard R. Visconti, Providence, R.I., for plaintiffs.

Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for defendant.

OPINION

PETTINE, Chief Judge.

This is an action brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) by Constance C. D'Ambra and her husband Joseph A. D'Ambra for physical and emotional injuries sustained by the plaintiff wife and losses incurred by the plaintiff husband as a

result of the trauma suffered by Constance D'Ambra from witnessing her four year old son, Gregory A. D'Ambra, being struck and killed by a United States mail truck.

The defendant moved to dismiss this case pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a cause of action. By stipulation of the parties, the motion to dismiss was decided on the basis of the transcript and the findings of fact made by this Court in *Joseph A. D'Ambra v. United States of America*, C.A. No. 4545. (March 17, 1972). In that case the Court found, inter alia, that the mail truck driver was negligent and that both Constance D'Ambra and her son were free from contributory negligence, and accordingly imposed liability for wrongful death on the defendant. This finding of liability was affirmed by the First Circuit Court of Appeals in *D'Ambra v. United States*, No. 72–1205 (October 24, 1972).[1]

On the basis of these facts and the eyewitness status of the mother to the accident, this Court held that a cause of action for the negligent infliction of psychic injury exists under Rhode Island law. *D'Ambra v. United States*, 354 F. Supp. 810 (D.C.R.I.1972).

During the course of the pre-trial proceedings of this case, the issue arose as to the collateral estoppel effect of the findings of fact on the negligence of the mail truck driver made in *Joseph A. D'Ambra v. United States of America*, supra. Whether there is estoppel in the case at bar depends on whether the principle of mutuality of estoppel applies. Under this doctrine, Constance D'Ambra would not be able to assert offensively the findings made against the government in the wrongful death action since the government would not have been able to use such findings, if in

their favor, against her as she was not a party, nor in privity to a party, in the prior adjudication.

■ Rhode Island law governs the issue of collateral estoppel. See *Filice v. United States*, 271 F.2d 782, 783 (9th Cir. 1959). There is, however, no Rhode Island precedent on this issue. In such circumstances, this Court is duty bound to predict the law of Rhode Island.

The trend in both federal and state courts is away from the rigid requirements of mutuality of estoppel. *Blonder-Tongue v. University Foundation*, 402 U.S. 313, 326, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1970). The landmark case rejecting this doctrine, *Bernhardt v. Bank of America*, 19 Cal.2d 807, 122 P.2d 892, 895 (1942) established in its stead the following criteria for the evaluation of the applicability of res judicata:

". . . Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?"

■ The test of the fairness of rules of res judicata, as has been stated so well by Judge Hastie is

". . . the achievement of substantial justice rather than symmetry . . ." *Bruszewski v. United States*, 181 F.2d 419, 421 (3rd Cir. 1950) cert. den. 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); cited in *Blonder-Tongue v. University Foundation*, supra at 305, 91 S.Ct. 1434.

Applying the *Bernhardt* rules to this case, the defendant would be estopped from the relitigation of the issues of negligence. However, the defendant does not have any cause to complain since he has already enjoyed full oppor-

1. *D'Ambra v. United States*, No. 72–1205 (October 24, 1972) also requested argument on whether the Rhode Island Wrongful Death Act is punitive within the meaning of the Federal Tort Claims Act. In a later opinion, the First Circuit Court of Appeals held that the Rhode Island Wrongful Death Act is punitive and established a judicial formula for the computation of damages for wrongful death. *D'Ambra v. United States of America*, No. 72–1205 (June 7, 1973).

tunity to litigate these issues. Furthermore, I am persuaded that the adoption of the *Bernhardt* rules will minimize litigation and economize judicial time. See 1 B J. Moore, Federal Practice paragraph 0.412[1] p. 1809. I therefore find that the courts of Rhode Island would adopt the principles set forth in *Bernhardt*, if confronted with this question and that the defendant is collaterally estopped from the relitigation of the findings on negligence.

Moreover, and perhaps independently dispositive of the issue of collateral estoppel, is the fact that the defendant did not object to the application of collateral estoppel, although specifically invited to do so by this Court. See Pre-trial Order of December 26, 1972.

Given the pre-trial rule on collateral estoppel, *id.*, the scope of this trial was limited to the issues of causation and damages.

## FINDINGS OF FACT

On the basis of the testimony given by Constance C. D'Ambra,[2] her husband, Joseph D'Ambra and the psychiatrist who treated her, Doctor Eufrocino N. Beltran, I find the following descriptions of Constance D'Ambra to be true. Prior to June 2, 1970 (the date of the accident with Gregory) Constance D'Ambra was in good health, had a good relationship with her husband and children, slept well, had the reputation of being a calm person, was fairly cheerful and happy, and never consulted a psychiatrist or took a tranquilizer. Since that date and up to the present time she has suffered a loss of appetite, has trouble sleeping, and has nightmares of the accident and of her son covered with blood. Occasionally she pounds on the table in the kitchen, and according to her husband, she sometimes pounds on the bed while she sleeps. She re-experiences the sensation of warm blood running down her body, as when she picked up her son

at the scene of the accident. When it is inclement weather, she tends to wonder whether her son is cold and wet. Because she is reminded of Gregory when she holds her recently born twins, she has trouble holding them. And she is afraid that an accident similar to the one that happened to Gregory will befall her other children.

Constance D'Ambra has had limited psychiatric treatment. She saw Doctor Beltran on five occasions: July 24, 1970; July 31, 1970; August 17, 1970; September 14, 1970; and March 9, 1973. She rejected treatment after the visit of September 14 because she felt that no one could help her.

Doctor Beltran diagnosed the condition of Constance D'Ambra as psychoneurosis, depression type. He characterized her withdrawal from treatment in 1970 as a manifestation of her psychoneurotic state.

According to Doctor Beltran, there had been progressive improvement in the mental condition of Constance D'Ambra during the 1970 visits. At that time his prognosis of treatment time was two to four months. At the 1973 visit, Doctor Beltran testified that Constance D'Ambra was more depressed than she had been at her first visit with him in 1970. He now estimates that she required two to three years of weekly one hour sessions with a psychiatrist. The fee for such medical services is forty dollars per hour.

Doctor Beltran further testified that on her first visit with him Constance D'Ambra related that in spite of her emotional state, she was able to carry out her household routine, although not without certain difficulty. There is no evidence that the psychoneurosis has since interfered with the fulfillment of Constance D'Ambra's roles of housekeeper and mother, except for the aforementioned uncomfortableness in holding the twins.

---

2. Part of the testimony of Constance D'Ambra was orally presented by Constance D'Ambra and part of the testimony was entered orally by counsel for the plaintiff per stipulation of the parties.

Two doctors testified as to the cause of the plaintiff's psychoneurosis. Doctor Beltran gave his opinion based on his treatment of Constance D'Ambra. Doctor Thomas Greason gave his opinion in response to a multi-portioned hypothetical question. Both doctors testified that viewing the accident would be sufficient to cause the psychoneurosis. However, they both additionally testified that if she had not seen the accident, but instead heard of the accident, a similar psychoneurosis might have developed. Doctor Greason testified that witnessing the accident probably increased the trauma. The opinion of Dr. Beltran was that witnessing the accident brought about a more intense and prolonged mental effect than would have otherwise resulted. Neither doctor was able to define the difference in degree of severity of depression between witnessing such an accident and only hearing about it. According to Doctor Greason, there is no method of the computerization of such a difference. Doctor Beltran expressed the view, and I so find, that the witnessing of the accident plus the actual loss of the child by death produced the psychoneurosis.

## DISCUSSION OF LAW

*Simone v. The Rhode Island Company*, 28 R.I. 186, 66 A. 202 (1907) established that there can be recovery for the fright experienced from the defendant's negligence, when that fright is followed by physical ills, or gives rise to nervous disturbances which in turn lead to physical ills. This rule allowing recovery only when there are concomitant or subsequent physical manifestations of the psychic trauma was reaffirmed in *Bedard v. Notre Dame Hospital*, 89 R.I. 195 151 A.2d 690 (1959).

The threshold issue thus is whether a psychoneurosis is a category of "physical ills." There is no guidance on this issue from the Rhode Island Courts. In *Simone v. The Rhode Island Company*, *supra* at 188, 66 A. 202, the ills alleged were of a type indisputably physical, including vomiting, insomnia, headache,

pains in the left side, left leg, and back, weakness, and fainting attacks. In *Bedard v. Notre Dame Hospital, supra*, there was involved a claim for damages for "unadulterated" mental anguish caused by the retention of the plaintiff's son in a hospital, until the hospital bill was paid. The Court held that under the rule of *Simone*, such mental anguish could not be the basis of an award for damages.

It is thus necessary for this Court to ascertain the law of Rhode Island on the status of psychoneurosis. On the process of prediction, it has been written:

"At its best, it is the wise and experienced use of many sources in combination . . . it is . . . logic, both inductive and deductive." Corbin, the Laws of the several States, 50 Yale L.J. 762, 775–6 (1941), quoted in H. Hart and H. Wechsler, *The Federal Courts and the Federal System*, 630 (1953).

It is elementary that the scope of a rule can only be determined in the light of its purpose. One apparent intent of the *Simone* doctrine is to ferret out those claims of injury caused by fright which are most amendable to fraud. It therefore is the objective manifestation of the injury which is crucial, not whether the injury is, in conventional terms, physical or mental.

The First Circuit has reached a similar conclusion. In *Petition of United States*, 418 F.2d 264 (1st Cir. 1969), the Court stated:

"The term 'physical' is not used in its ordinary sense for purposes of applying the 'physical consequences' rule. Rather, the word is used to indicate that the condition or illness for which recovery is sought must be one susceptible of objective determination. Hence, a definite nervous disorder is a 'physical injury' sufficient to support an action for damages in negligence. *Espinosa v. Beverly Hospital*, 114 Cal.App.2d 232, 249 P.2d 843 (1953); *Bowman v. Williams* [164 Md. 397, 165 A. 182 (1933)]; *Savard v. Cody*

*Chevrolet, Inc.* [126 Vt. 405, 234 A.2d 656 (1967)]."

■ Buttressing this interpretation of the physical consequences rule is the fact that the *Simone* Court quoted approvingly the following statement from *Sloane v. Southern Cal. Ry. Co.*, 111 Cal. 668, 680, 44 P. 320:

"The real question presented by the objections and exception of the appellant is, whether the subsequent nervous disturbance of the plaintiff was a suffering of the body or of the mind. The interdependence of the mind and body is in many respects so close that it is impossible to distinguish their respective influence upon each other. *It must be conceded that a nervous shock or paroxysm, or a disturbance of the nervous system, is distinct from mental anguish,* and falls within the physiological, rather than the psychological, branch of the human organism. *It is a matter of general knowledge that an attack of sudden fright or an exposure to imminent peril has produced in individuals a complete change in their nervous system, and rendered one who was physically strong and vigorous weak and timid. Such a result must be regarded as an injury to the body rather than to the mind, even though the mind be at the same time injuriously affected.*" *Simone v. The Rhode Island Co.,* *supra* at 200, 66 A. at 208. (emphasis added).

A psychoneurosis is defined by a certain complex of symptoms. It is a "definite nervous disorder" for which recovery can be had under the "physical consequences rule." In accord, *Petition of United States, supra.* I have found that the psychoneurosis of Constance D'Ambra was precipitated both by the trauma of witnessing the accident and by the actual death of the child. However, the cause of action at bar is solely for the fright and mental distress of a mother caused by seeing her child in peril and grievously wounded or killed.[3] The question arises, therefore, can the emotional injury of Constance D'Ambra be apportioned between the trauma of viewing the accident and the death of the child? On the state of the record, I can find no rational basis for such apportionment. Although both expert witnesses testified that witnessing such an accident is a severe trauma which probably intensified any psychoneurosis attributable to the death of the son, neither could estimate the degree of exacerbation. The legal issue is whether the plaintiff must be denied recovery in view of the impracticality of allocation of injury. For reasons stated, *infra*, I find recovery should not be denied this plaintiff.

There is no controlling precedent at hand. However, decisional law as to the liability of joint tortfeasors and the comments of legal academicians offer a base for analogies from which the issue can be resolved. When the harm caused a person by several tortfeasors is theoretically separable, the prevailing rule has been that each tortfeasor is liable only for that portion for which he is responsible, 2 Harper and James, The Law of Torts § 20.3 at 1125, and the plaintiff has the burden of proof as to the extent of each defendant's contribution. In the absence of such proof, the plaintiff, of course, foregoes all recovery.

Legal scholars have, nevertheless, long advocated shifting the burden of proof to the defendant. See Wigmore, Joint Tortfeasors and Severance of Damages, 17 Ill.L.Rev. 458 (1923); Carpenter, Workable Rules for Determining Proximate Cause, 20 Calif.L.Rev. 396, 406 (1932). Professor Wigmore pointed out that the rationale of the imposition of joint and several liability when there is a concert of action among tortfeasors— "the unfairness of putting on the injured party the impossible burden of

---

3. Emotional injury from bereavement resulting from negligence is not the basis of a cause of action. Such a cause of action is precluded by the likelihood of unlimited liability and disproportionate liability in relation to culpability.

proving the specific shares of harm done by each and the ingenuity of letting all . . . go scot free *because the respective shares cannot be ascertained"* —is equally applicable whenever several tortfeasors cause a harm which is not "obviously assignable in parts to the respective wrongdoers." Wigmore, *supra* 458, 459.

The Restatement of Torts, Second has adopted this rule that the burden of proof on apportionment of harm falls on the tortfeasor in § 433B(2) which provides:

"(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."

The justification given in the Reporter's Comment for this provision is essentially the same as that given by Professor Wigmore:

"The reason for the exceptional rule placing the burden of proof as to apportionment is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned."

Restat.Torts 2d. Comment at 444.

In spite of the opinion of eminent authorities and the position of the Restatement, courts have shifted the burden of proof on apportionment in only two limited areas. Several courts have adopted the rule of the Restatement in the case of injury caused by the chain collision of automobile. *Maddux v. Donaldson,* 362 Mich. 425, 108 N.W.2d 33 (1961); *Rund v. Grimm,* 252 Iowa 1266, 110 N.W.2d 321 (1961); *Holtz v. Holder,* 101 Ariz. 247, 418 P.2d 584 (Ariz.1966); *Mat-*

*thews v. Mills,* 288 Minn. 16, 178 N.W.2d 841 (1970); *Fugere v. Pierce,* 5 Wash. App. 592, 490 P.2d 132 (1971). The rationale of these cases is based on the unfairness of the imposition of the burden of proof on the innocent victim as opposed to the defendant.

Also, where the negligent infliction of injury aggravates a pre-existing condition or disease, and no apportionment is possible, it has been held that the defendant is liable for the entire damage, i. e. *Newbury v. Vogel,* 151 Colo. 520, 379 P.2d 811 (1962); (pre-existing arthritic condition); *Kawamoto v. Yasutoke,* 49 Haw. 42, 410 P.2d 976 (1966) (possible prior back problems and an arthritic condition; *Blaine v. Byers,* 91 Idaho, 665, 429 P.2d 397 (1967) (pre-existing arthritic condition); *Matsumoto v. Kabu,* 52 Haw. 629, 484 P.2d 147 (1971) (pre-existing back pain); *Wise v. Carter,* 119 So.2d 40 (Fla.App.1960) (prior injury). The justifications for this principle are, however, different from that used in the multi-collision cases. It is sometimes said that a tortfeasor takes his victim as he finds him. See *Blaine v. Byers, supra.* Another rationale is that when a prior condition does not cause pain or disability, the injury caused by the tortfeasor is the proximate cause of the pain or disability. Comment Apportionment of Damages, 49 Denver L.J. 115, 116 (1972) and cases cited therein. See also *Newbury v. Vogel, supra.*

There is no law in Rhode Island on the rule for burden of proof on apportionment where the injury is for practical purposes indivisible. Nor is there Rhode Island case law on the rule to be applied when a tortfeasor aggravates a pre-existing condition or disease of his victim. Again, it is necessary to predict the law of Rhode Island.

The first consideration is whether the fact that the case at bar does not involve injury caused by several tortfeasors who have the possibility of haggling liability among themselves should preclude the imposition of the burden of proof on the

defendant. I cannot find that it should. Where an injury which is indivisible is caused by the negligence of the defendant concurring with an innocent cause, as a force of nature, the defendant is held responsible for the entire injury. *Haverly v. State Line & S.R. Co.*, 135 Pa. 50, 19 A. 1013 (1890) (fire caused by negligence and wind); *Jackson v. Wisconsin Tel. Co.*, 88 Wis. 243, 60 N.W. 430 (1894) (negligently left wire plus lightning); *Long v. Crystal Refrig. Co.*, 134 Neb. 44, 277 N.W. 830 (1938) (defective building plus wind), and where an injury is theoretically divisible and one cause is innocent, the circumstance most analogous to the instant case, the aggravation of pre-existing injury cases constitute authority for holding the tortfeasor totally liable. Although the logic of these later cases cannot be extrapolated to the instant case, they do illustrate the proposition that each type of case must be evaluated to determine the fairness of shifting the burden of proof to the defendant.

The rationale of Professor Wigmore and the Restatement 2d for the allocation of the burden of proof to the defendant is applicable here. However, the unique circumstances of the case at bar form even more compelling reason for the adoption of the rule in this class of cases. The defendant is responsible for *both* causes of the injury. He is saved from liability for psychic injury for loss of a child only because of policy reasons. The burden of proof of allocation of injury should clearly be on him and not the innocent plaintiff.

■ Since there was no basis for allocation presented in the record, I hold the defendant liable for the entire psychoneurosis.[4]

Having ruled that the plaintiff is entitled to a verdict, I must award a sum which will compensate her for the injury she has suffered. Past medical expenses amount to only eighty-four dollars and there is no loss of earnings to be considered. Therefore, the prime determination to be made is the parameters of recovery for mental injury.

■ It is well established law that in a single negligence case any award of damages must not be punitive nor can it be speculative but rather it must be based on the evidence so as to reasonably compensate the injured party. The difficulty lies in computing a just sum.

"The law measures the compensation for suffering of this kind, as of course, in terms of money. While the device of the law may be inadequate, it has been said that to forbid the consideration of the elements of mental suffering, because the law scales are not perhaps sufficiently delicate for their measurement, is equally to condemn the use of the scales in all other directions and in the very cases and for the very purposes now admittedly sanctioned by the law." 22 Am. Jur.2d sec. 198, n. 21, citing *Merrill v. Los Angeles Gas & E. Co.*, 158 Cal. 499, 111 P. 534.

There are no guidelines in precedent offering a basis for such calculations. However, as I have noted, this impreciseness in the law does not bar · ecovery but rather places the entire buiden on the court or jury, as the case may be, whose calculations must stem from maturity of judgment in analyzing the factual situation before it and thus give some form to an amorphus legal conundrum.

4. There is a second possible approach to the problem. Where two causes are substantial factors in producing a single indivisible result, each is charged with all of it. Prosser, The Law of Torts 250 (3d ed.). The classic case is that of two automobiles colliding and injuring a third person. *Id.*

It may be conceptually possible to characterize a psychoneurosis as a single indivisible result. However, this rule of indivisible injury was developed in relation to physical injury. With emotional injury, there is feedback from the person effected which can serve as a basis for the determination by a psychiatrist of the cause(s) of the psychic hurt. The court therefore believes that a mental disorder should be regarded as theoretically divisible.

My findings of fact detail the psychiatric manifestations of the plaintiff together with the doctor's opinion as to necessary future treatments. Considering this data it is my considered opinion the plaintiff has not established a permanent disability within that degree of certainty warranting an award of damages on such a basis. Dr. Beltran, as I have found, estimates she requires two to three years of weekly one hour psychiatric sessions at an estimated cost of forty ($40) dollars per hour. Conceding the patient's mind could still be triggered into a depression at some time subsequent to the conclusion of these treatments, the probability and possibilities of her mental susceptibility and factual setting coalescing at the right time are in this case too conjectural and speculative for consideration by the Court.

I find a fair award is and do hereby enter judgment in the amount of $10,000 to plaintiff Constance C. D'Ambra and in the amount of $84.00 for actual expended medical expenses to plaintiff Joseph A. D'Ambra.