**Nora Faye JOHNSON,
Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

No. 76–2197.

United States Court of Appeals,
Fifth Circuit.

July 13, 1978.

---

Gary B. Tullis, Charles H. Murchison, Jacksonville, Fla., for plaintiff-appellant.

John L. Briggs, U. S. Atty., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for defendant-appellee.

Before GEE and FAY, Circuit Judges.*

* Judge Tuttle was a member of the original panel but did not participate in this decision. The case is being decided by a quorum. *See* 28 U.S.C. § 46.

GEE, Circuit Judge:

In this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), we are called upon to determine the appropriate doctrines of res judicata and collateral estoppel that are to be applied under this statute. The facts of the case set out a particularly compelling drama. In May 1970, Sergeant Jimmy Ray Johnson moved with his wife, Nora Faye Johnson, appellant in the instant case, and their two young children to the vicinity of Fort Stewart, Georgia, where Sergeant Johnson had been posted. During that summer Sergeant Johnson approached an army chaplain about his marital difficulties, apparently brought on by differences over the manner in which Johnson disciplined the children, a manner that Mrs. Johnson thought much too severe. During the late summer and fall of 1970 the Johnsons received marriage counseling at the post's Mental Hygiene Clinic. Although much of the Johnsons' contact was with lower ranking clinic staff, the clinic psychiatrist, Dr. Charles Meredith, noted the sergeant's possible mental illness and in September ordered him hospitalized for ten days; the discharge diagnosis was paranoid schizophrenia. Sergeant Johnson was prescribed anti-psychotic medication for this condition, but he soon stopped taking the medication.

Over these autumn months the Johnsons' relationship experienced ups and downs, but Sergeant Johnson on occasion complained at the clinic of agitation and nervousness. His wife reported that he continued to discipline the children severely and that he made threats of serious violence to her and others, along with threats of suicide. In early December Mrs. Johnson left her husband and went with her children to Jacksonville, Florida, where she stayed with her sister. There she admitted herself to a hospital for thirteen days, complaining of depression and an inability to cope with her family situation.

After her release she returned to Georgia to live with her brother, Carroll Johns, in Waynesville, about 80 miles from Fort Stewart. Although her Florida doctor had recommended that she not stay with her husband, she did see Sergeant Johnson on December 26, when he visited the Johns residence. The visit went badly: Sergeant Johnson wished to take the children to his mother's residence; his wife refused; Johnson threatened to shoot her, although he later calmed down.

Soon after the new year, on January 4, 1971, Johnson again saw Dr. Meredith at the clinic. Dr. Meredith noted Johnson's erratic behavior, learned that he had not been taking his medication, and once again started him on anti-psychotic drugs. Two days later Johnson got into a heated telephone dispute with his wife. He then went to the Johns residence and sexually assaulted her. As a result, Carroll Johns immediately took out a peace warrant, and within two days Johnson was in jail on the warrant. However, Mrs. Johnson and her brother were persuaded to permit Johnson to be released on condition that he return to the post hospital. Mrs. Johnson called Dr. Meredith to inform him of these events, as well as of the December 26 threat on her life.

Dr. Meredith saw Sergeant Johnson again on January 11, when Johnson came to the clinic under the escort of his unit commander; he was hospitalized the same day for a ten-day period. Dr. Meredith allowed him to be released from the hospital on January 21, again prescribing drugs and arranging a January 26 clinic appointment for Johnson. Two days later Johnson again went to Waynesville and saw his wife, this time without incident.

On January 25, Johnson requested leave from his unit commander to straighten out his domestic affairs. The captain, however, denied this request because he felt that Sergeant Johnson would only get into more trouble. Sergeant Johnson appealed to the battalion commander who, apparently after consulting Dr. Meredith, ordered that the leave be granted. Sergeant Johnson then met his wife in her brother's office in the presence of her brother and a deputy sheriff. The conversation quickly led to serious altercations, as did a telephone discussion

the next afternoon. That evening Sergeant Johnson appeared at the Johns residence, where he killed Carroll Johns by firing through a window with a shotgun. He then ran into the house to his wife's bedroom, shot and wounded her, and finally ran back outside where he shot himself to death.

Within the year both Carroll Johns' widow and Mrs. Johnson filed suit against the United States under the Federal Tort Claims Act. Both suits charged damage due to the negligence of army employees, particularly in the negligent release of Sergeant Johnson from the army hospital and base without warning. Carroll Johns' widow filed her wrongful death action in the United States District Court for the Southern District of Georgia; that case resulted in a judgment for Mrs. Johns. *Agnes Jacobs Johns v. United States*, Civil No. 769, decision filed August 6, 1973, appeal dism'd April 18, 1974, No. 73–4030, 5th Cir. 1974. Sergeant Johnson's widow, appellant in the present case, filed two actions in the United States District Court for the Middle District of Florida, one (case No. 71–921–CIV–J–T) seeking one million dollars in damages for her own injuries, and the other (case No. 71–922–CIV–J–T) seeking an additional one million dollars for her husband's wrongful death. The district court decided these companion cases together. It denied a motion for summary judgment based on the collateral-estoppel effects of the Johns case but did take into evidence the entire trial record of the prior case; after hearing additional testimony, the court concluded, contrary to the court in *Johns*, that there was no negligence on the part of any agent of the government and no malpractice on the part of Dr. Meredith in particular.

The parties agree that the Tort Claims Act requires the federal court generally to apply Georgia law in determining liability. But appellant argues, among other points, that the district court erred in failing to hold the United States collaterally estopped on the issue of negligence and cites numerous federal authorities in support of this position. The United States on its part urges that these federal authorities are in-

applicable and that under the Federal Tort Claims Act the court was required to apply the collateral estoppel rules of Georgia. That state's courts, unlike the federal courts, have retained the requirement of mutuality in applying principles of res judicata and collateral estoppel. *Mundy v. Cincinnati Insurance Co.*, 141 Ga.App. 106, 232 S.E.2d 621 (1977); *King Sales Co. v. McKey*, 105 Ga.App. 787, 125 S.E.2d 684 (1962). Thus, since the present appellant was not a party to the *Johns* case—and could not herself have been bound by any judgment or finding in that case—under Georgia rules she may not take advantage of the prior judgment and bind the United States to it, even though the United States was itself a party to the prior judgment. Hence, if the Georgia rules of collateral estoppel apply, the federal trial court did not err in refusing to bind the United States to facts established in the prior federal judgment, since Georgia courts would not have done so among themselves. On the other hand, if federal collateral estoppel rules apply, the United States arguably should have been estopped from reasserting its nonnegligence, since this issue was decided against it in the prior case. Thus, our initial question is whether a federal court, in considering the effect of the judgment of another federal court, should apply federal or Georgia rules of collateral estoppel in an action under the Tort Claims Act.

## I. *Federal or State Rules of Collateral Estoppel.*

■ We begin our inquiry by noting the significance of preclusionary principles for our judiciary. As we said in *Southwest Airlines Co. v. Texas International Airlines*, 546 F.2d 84, 94 (5th Cir. 1977):

> The principle of res judicata serves several policies important to our judicial system. By declaring an end to litigation, the doctrine adds certainty and stability to social institutions. This certainty in turn generates public respect for the courts. By preventing relitigation of issues, res judicata conserves judicial time and resources. It also supports several

private interests, including avoidance of substantial litigation expenses, protection from harassment or coercion by lawsuit, and avoidance of conflicting rights and duties from inconsistent judgments.

State and federal applications of res judicata principles may differ, however, as they do in the present case. Whether state or federal principles apply here must be resolved in the light of the Federal Tort Claims Act itself.

■■■ The primary purpose of the Federal Tort Claims Act was "to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States*, 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492 (1962). In deciding cases under this Act the federal courts generally apply state law, since the Act directs the federal courts to decide liability "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)—in this case, of course, Georgia. In *Richards* the Supreme Court noted that:

> It is evident that the Act was not patterned to operate with complete independence from the principles of law developed in the common law and refined by statute and judicial decision in the various States. Rather, it was designed to build upon the legal relationships formulated and characterized by the States.

369 U.S. at 6–7, 82 S.Ct. at 589.

In view of the paramount importance of state law under this Act, several courts have said, without discussion, that state rules of collateral estoppel are applicable to Tort Claims actions. *Filice v. United States*, 271 F.2d 782, 783 (9th Cir. 1959), *cert. denied*, 362 U.S. 924, 80 S.Ct. 677, 4 L.Ed.2d 742 (1960); *D'Ambra v. United States*, 396 F.Supp. 1180 (D.R.I.1973); *State of Maryland v. Capital Airlines, Inc.*, 267 F.Supp. 298 (D.Md.1967); *Bagge v. United States*, 242 F.Supp. 809 (N.D.Cal.1965); *see also Falk v. United States*, 375 F.2d 561 (6th Cir. 1967). With all respect we cannot regard these authorities as controlling in our

resolution of the issue. Some of these cases concerned the res judicata or collateral estoppel effect to be accorded a prior *state* court judgment, a matter we regard as substantially different from the effect to be accorded a prior federal judgment. *Bagge, supra; see also Falk, supra*. None of them involved a situation in which the state rules of collateral estoppel, and particularly mutuality requirements, differed from the federal practice. Indeed, in two of these cases, *D'Ambra* and *Capital Airlines*, the courts found no controlling state decisions on the matter and "predicted" state collateral estoppel in part by citing leading federal cases. In *Capital Airlines*, 267 F.Supp. at 303, the court noted prominently that "this court looks with favor on the modern trends in this area"—trends that have been largely accepted in the federal courts but rejected in Georgia. For these reasons, and because none of these opinions discussed the rationale for applying state collateral estoppel doctrine, we cannot view them as standing for the proposition that state doctrine controls the collateral estoppel effect given by one federal court to the judgments of another, where the state doctrine in question continues to apply a mutuality rule that has been substantially modified in the federal courts.

Contrary to these cases, appellant here urges that we adopt the reasoning of *Aerojet-General Corp. v. Askew*, 511 F.2d 710 (5th Cir.), rehearing denied, 514 F.2d 1072, *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). In that diversity case we held that in diversity jurisdiction, as in federal-question jurisdiction, the federal doctrine of res judicata governs the question of whether a federal court is bound by the prior judgment of another federal court. Appellant argues that *Aerojet* controls the present case because actions in diversity are comparable to Tort Claims actions, since in each instance the federal court is generally bound to apply state law. If in a diversity case a federal court is nevertheless bound to give federal res judicata effect to a prior federal judgment, appellant urges, then by parity of reasoning

a federal court should be similarly bound by a prior federal judgment in a Tort Claims action.

On its part, the United States urges that *Aerojet* does not govern the present case. Its first argument is based on a distinction between res judicata and collateral estoppel. It points out that *Aerojet* concerned res judicata, whereas the present case concerns collateral estoppel. Thus, it argues, even supposing that *Aerojet* applied to Tort Claims actions, it would not control the present case.

■ While the term "res judicata" in its broadest sense encompasses collateral estoppel, in a narrower sense these two phrases do carry different although related meanings. Under the principles of "res judicata" in the narrower sense, a judgment in a prior suit between the same parties bars a suit on the same cause of action not only as to all matters offered at the first proceeding, but also as to all issues that could have been litigated. Collateral estoppel, however, precludes relitigation only of those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action. *Moch v. East Baton Rouge Parish School Board*, 548 F.2d 594, 596 (5th Cir. 1977), and cases cited therein. However, in *Willis v. Fournier*, 418 F.Supp. 265 (M.D.Ga.), *aff'd without opinion*, 537 F.2d 1142 (5th Cir. 1976), it was held that the *Aerojet* doctrine applied to collateral estoppel as well as to res judicata in diversity cases. We see no cogent reason for distinguishing these doctrines in connection with the preclusive effects of a prior federal judgment on a subsequent federal suit, and we regard *Willis* as settling the matter insofar as diversity cases are concerned.

The present case is not in diversity jurisdiction, however, and the United States' second and more troubling argument relates to this point. It argues that despite similarities between federal tort claims actions and actions in diversity jurisdiction, federal courts in Tort Claims actions are required by statute to follow state law. It refers particularly to *Richards v. United States, supra.* In *Richards* the Supreme Court ruled that federal courts, in deciding actions under the Tort Claims Act, were required to apply the conflict-of-laws rules of the state where the act or omission occurred. This is, of course, also true of federal courts acting in diversity jurisdiction, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); but in *Richards* the Court stated that it did not rely on conflicts principles developed for diversity actions. This was because jurisdiction in Tort Claims actions is based on a federal statute, and this very statute directs the federal courts to apply the law of the state "where the act or omission occurred." Thus, in its holding on the issue of applicable conflicts rules in Tort Claims actions the Court relied not on principles developed for diversity jurisdiction but on the independent language of the Tort Claims Act itself.

■ *Richards* thus requires that in considering the collateral estoppel rules to be applied in actions under the Tort Claims Act, we look to that statute, as well as to the other federal statutory provisions relating to damage actions against the United States. We note preliminarily that although *Richards* stated that the "whole law" of the state is to be applied in Tort Claims actions, 369 U.S. at 11, 82 S.Ct. 585, its holding in fact concerned conflicts of laws principles—principles that affect the substantive liability of parties to an action. Moreover, while it has been widely held—by this court as by others—that state law governs the liability of the parties in Federal Tort Claims actions, these cases overwhelmingly concern the elements of causes of action, defenses, or damages that a party may claim, rather than issues of internal court procedure or the relationships between courts. *See, e. g., United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Edwards v. United States*, 519 F.2d 1137 (5th Cir. 1975), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2170, 48 L.Ed.2d 795 (1976); *Roelofs v. United States*, 501 F.2d 87 (5th Cir. 1974); *Orr v. United States*, 486 F.2d 270 (5th Cir. 1973);

*Ciccarone v. United States*, 486 F.2d 253, 257 (3d Cir. 1973). As we said in *Orr v. United States, supra* at 274, the Federal Tort Claims Act requires that a federal court must decide by state law "what constitutes a legal duty and when such a duty has been breached." Such cases reflect the basic purposes of the Federal Tort Claims Act: to allow tort suits against the United States—with due regard for statutory exceptions—thus eliminating the need for private bills in Congress while avoiding injustice to private persons having meritorious claims who were previously barred from suit. *Muniz, supra; Richards, supra; Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

But despite the fact that state law governs the right of action under the Act, federal courts routinely apply such federal procedural rules as the "clearly erroneous" test under F.R.Civ.P. 52(a). *Neal v. United States*, 562 F.2d 338 (5th Cir. 1977); *Dickens v. United States*, 545 F.2d 886 (5th Cir. 1977); *In re Air Crash Disaster at New Orleans*, 544 F.2d 270 (6th Cir. 1976); *Felder v. United States*, 543 F.2d 657 (9th Cir. 1976). They have done so even where the state standard of review may differ. *Felder, supra.*

Moreover, recovery under the Act is subject to the limitations inherent in the language of the Tort Claims Act itself, as well as the explicit limitations of 28 U.S.C. §§ 2401–16, 2671–80. In interpreting these limitations, a court may be required to apply federal law. *See* C. Wright & A. Miller, Federal Practice & Procedure: Civil § 3658. Thus, for example, it has been held that federal law governs the interpretation of 28 U.S.C. § 2401, concerning the running of the statute of limitations in a Federal Tort Claims action. *Ciccarone, supra; Mendiola v. United States*, 401 F.2d 695 (5th Cir. 1968). Similarly, the Supreme Court looked only to the legislative history and statutory language under 28 U.S.C. § 2680 in determining the scope of the "discretionary function" exception to Tort Claims Act liability. *Dalehite, supra*, 346 U.S., at 28–30, 73 S.Ct.

956. And again, in *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), the Court ruled that state tort law did not govern the question whether the United States could ever be held liable under the Tort Claims Act where there was neither negligence nor wrongful act; rather, the statutory language is "a uniform federal limitation on the types of acts . . . for which the United States has consented to be sued." 406 U.S. at 799, 92 S.Ct. at 1900. *See also, Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400 (7th Cir. 1974), *cert. denied, sub nom., Forth Corp. v. Allegheny Airlines, Inc.*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975); *Williams v. United States*, 405 F.2d 234 (5th Cir. 1968). Such statutory limitations are essential considerations in any federal court judgment under the Act.

Thus, in deciding a Federal Tort Claims action, a court may well be called upon to make determinations of federal law, even though state law governs general liability under the Act. These decisions on federal law will, of course, be an integral part of the judgment to which res judicata or collateral estoppel principles apply.

■ In view of these considerations we think that under the Federal Tort Claims Act a federal court should apply federal principles of res judicata and collateral estoppel in considering the preclusive effect of a prior federal judgment. We note that Congress has lodged exclusive jurisdiction in the federal courts over Tort Claims actions, and we cannot believe that Congress intended state court rules to determine the internal relationships among the federal courts—particularly with regard to the effect one federal court is to give to the judgment of another.

While we are mindful that under *Richards* diversity jurisdiction principles do not govern Tort Claims actions, we think that similar considerations may apply to the federal courts' handling of these two very similar kinds of actions. *See, e. g., Application of the "Law of the Place" under the Federal Tort Claims Act*, 58 Iowa L.Rev. 715

(1973). In both types of cases the federal court applies state law; indeed, in both types of cases the federal court essentially acts as a state court. Yet *Aerojet* holds that in diversity cases we are to apply federal res judicata principles to prior federal judgments. We think that the factors enumerated in *Aerojet* with respect to res judicata issues in diversity cases are equally present in Tort Claims actions. First, *Aerojet* particularly stressed that:

> The importance of preserving the integrity of federal court judgments cannot be overemphasized—out of respect for the federal courts and for the policy of bringing litigation conclusively to an end. If state courts could eradicate the force and effect of federal court judgments through supervening interpretations of the state law of res judicatd, federal courts would not be a reliable forum for final adjudication of a diversity litigant's claims.

511 F.2d at 716. This consideration applies equally to Tort Claims actions.[1]

Second, *Aerojet* noted that a number of federal procedural issues affect the application of res judicata in diversity cases. Similarly, as noted above, a number of federal matters affect federal court decisions in Tort Claims actions; as in *Aerojet*,

> We see no persuasive reason to look to state law for some elements of res judicata . . . in light of the prominent influence of federal law on other elements of the doctrine. To do so would sacrifice the uniformity of the law which federal courts must apply.

511 F.2d at 717.

In Aerojet we quoted at length the case of *Kern v. Hettinger*, 303 F.2d 333, 340 (2d Cir. 1962), and we again note its reasoning:

> One of the strongest policies a court can have is that of determining the scope of its own judgments. [Citations omitted] It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity. The rights and obligations of the parties are fixed by state law. These may be created, modified and enforced by the state acting through its own judicial establishment. But we think it would be strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights.

We see no reason for distinguishing Tort Claims actions from diversity actions in this respect. Our decision, of course, does not apply to the preclusive effects to be accorded prior *state* court decisions. In such cases we may well be bound, as we are in diversity cases, to give effect to state principles as to the preclusive effect of a prior state court decision. *See Cleckner v. Republic Van & Storage Co.*, 556 F.2d 766 (5th Cir. 1977). We think, however, that the appropriate reading of the Tort Claims Act requires that we recognize, as we do in diversity actions, that "the federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction." *Byrd v. Blue Ridge Rural Electric Cooperative*, 356 U.S. 525, 537, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958). The effect that federal courts give to the judgments of other federal courts is an integral feature of that independent system. We think that Congress intended to leave intact that feature when it charged the federal courts with the duty of applying state law under the Federal Tort Claims Act.

## II. *Application of Federal Collateral Estoppel Principles.*

■ Although the United States concedes that it is bound by the ruling on the

---

1. *Aerojet* noted the particular importance of protecting parties from prejudice in diversity cases—a purpose that could be defeated if state res judicata rules could nullify federal judgments. 511 F.2d at 716 n.6. We think that similar considerations apply to Federal Tort Claims actions; in giving exclusive jurisdiction to federal courts over these actions, Congress presumably wished to make certain that only federal courts would decide the tort liability of the United States, even though those courts apply state law.

negligence issue in the prior case if federal collateral estoppel rules apply, we think this problem bears some further discussion. In its landmark decision in *Blonder-Tongue Labs, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court ruled, in the context of a patent infringement suit, that the doctrine of mutuality need not apply under federal principles of collateral estoppel. *See also, Zdanok v. Glidden Co.*, 327 F.2d 944 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); *Bruzewski v. United States*, 181 F.2d 419 (3d Cir.), *cert. denied*, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950). This court has followed the modern doctrine favored in *Blonder-Tongue* and has ruled that under federal principles a party who has had a full and fair opportunity to litigate an issue decided in a prior suit may be precluded from relitigating that issue in a subsequent action, even though the subsequent adversary was not a party to the prior litigation. *See, e. g., Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Rachal v. Hill*, 435 F.2d 59 (5th Cir. 1970), *cert. denied*, 403 U.S. 904, 91 S.Ct. 2203, 29 L.Ed.2d 680 (1971). In adopting this position we have cited the reasoning of *Bruzewski* to say:

> A party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time. Both orderliness and reasonable time saving in judicial administration require that this be so *unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case.*

*Rachal, supra* at 63 (original emphasis); *Bruzewski, supra* at 421. Thus, in precluding a party from relitigating an issue, the court must be satisfied not only that the party against whom estoppel is urged has had a full and fair opportunity to litigate

the issues in the prior proceeding but also that application of the doctrine, under the circumstances, will not result in injustice to the party. *Rachal, supra* at 62. Moreover, the court must be satisfied that the application of res judicata or collateral estoppel does not contravene any overriding public policy. *Garner v. Giarrusso*, 571 F.2d 1330, 1336 (5th Cir. 1978); *Moch, supra*.

In considering fairness to the party against whom preclusion is urged, we have noted that there may be special difficulties in precluding a party who did not have the initiative in the prior action. *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451 (5th Cir.), *cert. denied sub nom., City Trade & Industries, Ltd. v. Allahabad Bank, Ltd.*, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971).[2] Such a party may have been defending only against a relatively small claim in the prior case and thus may not have been motivated to litigate as vigorously as he would have had the subsequent case been tried first; moreover, he may have had no opportunity to choose or change the forum of the original action. *Talcott, id.* at 461, 462. *See also Berner v. British Commonwealth Pacific Airlines, Ltd.*, 346 F.2d 532, 540 (2d Cir. 1965), *cert. denied*, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). In *Zdanok*, 327 F.2d at 956, the Second Circuit also noted that "offensive" uses of collateral estoppel could result in anomalous results for a defendant in the multiple plaintiff tort context and suggested that considerations of fairness might rule out application of collateral estoppel where the party against whom the plea was asserted faced more than two successive tort actions. Thus, the offensive use of collateral estoppel calls for the courts to use special care in examining the circumstances to ascertain that the defendant has in fact had a full and fair opportunity to litigate and that preclusion will not lead to unjust results. *See, e. g., United States v. United Airlines*, 216 F.Supp. 709, 728 (E.D. Wash.1962), *aff'd in relative part sub nom.,*

---

**2.** In *Blonder-Tongue* the Supreme Court touched on the question of collateral estoppel applied offensively. But the Court specifically noted that *Blonder-Tongue* itself did not involve such "offensive use" questions. 402 U.S. at 329–30, 91 S.Ct. 1434.

*United Airlines v. Wiener*, 335 F.2d 379, 404 (9th Cir.), *cert. dism'd*, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964). But as we said in *Talcott*, "if they determine that his inability to choose a forum had no prejudicial effect, that he had a pressing motive to litigate fully, that there was extensive litigation of the issues, the prior judgment will be given effect regardless of his defensive position in the prior suit." 444 F.2d at 462.[3] One of the most important considerations is whether, at the time of the earlier action, the party could foresee that facts subject to estoppel could be important in future litigation. *Mosher Steel Co. v. N. L. R. B.*, 568 F.2d 436, 440 (5th Cir. 1978).

Applying these tests to the instant case, the prior judgment clearly precludes relitigation of facts actually litigated and necessary to the earlier judgment. There was no prejudice to the United States in the choice of the Georgia district court as the forum; that court, as would any federal court in this Tort Claims action, applied Georgia law to the liability issue. Certainly the United States had a pressing need to litigate fully in the prior action, which resulted in a $350,000 judgment against the United States. That case thoroughly explored the relevant negligence questions at issue in the present case. Finally, it was entirely foreseeable that the facts of the prior judgment would be important in the present case, since charges of negligence in both cases involve identical circumstances.

 We therefore rule that, since federal principles of collateral estoppel applied, the United States was precluded from relitigating issues essential to the prior judgment. Because of our ruling on the preclusive effect of that prior judgment, we need not reach the appellant's further contention that the district court was in clear error in finding no negligence; the identical issues of negligence were, of course, litigated in the prior action. However, because other issues in the case—including that of proximate cause of damage to appellant—

were not disposed of in the prior judgment or necessary to it, we return the case to the district court for resolution of those outstanding questions. In ascertaining the precise preclusive effect of the prior judgment on particular issues, we refer the district court to the requirements set out, inter alia, in *International Association of Machinists and Aerospace Workers v. Nix*, 512 F.2d 125, 132 (5th Cir. 1975), and cases cited therein: "(1) The issue to be concluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been 'actually litigated'; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment."

REVERSED AND REMANDED.

---

**3.** In the context of applying state collateral estoppel rules, we have sustained an "offensive" preclusion in *Sequros Tepeyac S. A. v. Jernigan*, 410 F.2d 718 (5th Cir.), cert. denied, 396 U.S. 905, 90 S.Ct. 219, 24 L.Ed.2d 181 (1969).