Robert D. **RUFENACHT** and Robert W. Lewis, d/b/a **R&L Cattle Company**, Plaintiffs-Appellants,

v.

**IOWA BEEF PROCESSORS, INC.**, Defendant-Appellee.

**PROCHEMCO CATTLE PARTNERS, LTD.** and **Prochemco, Inc.**, Plaintiffs-Appellants,

v.

**IOWA BEEF PROCESSORS, INC.**, Defendant-Appellee.

No. 80–1818.

United States Court of Appeals, Fifth Circuit. Unit A

Sept. 17, 1981.

Charles W. Cunningham, Mike McKool, Jr., Dallas, Tex., for amicus curiae Brumley Estate, et al.

Edward W. Rothe, James T. Malysiak, Chicago, Ill., for Iowa Beef Processors, Ltd.

Before BROWN and GARZA, Circuit Judges, and CHARLES SCHWARTZ, Jr.*, District Judge.

CHARLES SCHWARTZ, Jr., District Judge:

Plaintiffs in these consolidated diversity actions, Robert D. Rufenacht and Robert Lewis d/b/a R&L Cattle Company, Prochemco Cattle Partners, Ltd., and Prochemco, Inc., brought suit against defendant, Iowa Beef Processors, Inc., seeking recovery of losses sustained as the result of cattle transactions involving one James Louie Heller, alleged by plaintiffs to have been acting as agent of defendant. Following non-jury trial the District Court, 492 F.Supp. 877, rejected plaintiffs' claims, and they now appeal from that adverse ruling. Appellants urge that the trial court erred in refusing to apply the doctrine of collateral estoppel with respect to the agency issue and in failing to find that Heller was defendant's agent in the subject transactions. Finding no error in the trial court's judgment, we affirm.

## THE PARTIES

Prochemco, Inc. (Prochemco) was a corporation engaged in the cattle feeding business. Prochemco owned and operated (either directly or through wholly own subsidiaries) four feed yards including Hereford Feed Yards at Hereford, Texas. These feed yards were all predominantly "custom" feed yards which, as agent or bailee-for-hire, fed and marketed slaughter cattle owned by ranchers or investors in return for a fee based on the cost of feed consumed plus overhead and profit.

James W. Witherspoon, Hereford, Tex., for Prochemco Cattle Partners, Ltd.

Neil E. Holmen, Chicago, Ill., for Rufenacht.

* District Judge of the Eastern District of Louisiana, sitting by designation.

Prochemco Cattle Partners, Ltd. (Prochemco Cattle Partners) was one of several syndicated and publicly offered limited partnerships formed by Prochemco to feed cattle as a tax-sheltered investment. Prochemco was the general partner and managed the entire operation of the partnership which consisted of purchasing feeder cattle, placing them on feed at Prochemco's feed yards on the same terms as ordinary custom feeders, and marketing the finished cattle.

R&L Cattle Company (R&L) was a private cattle feeding partnership consisting of Robert L. Rufenacht and Robert Lewis which fed pens of cattle at various custom feed yards, sharing profits and losses equally. Rufenacht was an owner and principal in the Chicago commodities brokerage firm of Rufenacht, Bromagen & Hertz (RB&H) which had a number of branch offices. Lewis was manager of RB&H's office at Larned, Kansas.

Iowa Beef Processors, Inc. (IBP) was a meat packer purchasing, slaughtering, processing and marketing beef. At all times pertinent the IBP plant closest to the Hereford, Texas cattle feeding area was at Emporia, Kansas almost 500 miles away.

James Louie Heller (Heller) was a cattle buyer whose status is at issue herein.

## THE FACTS

Heller's dealings with IBP began in 1964 or 1965 when he contacted IBP's head cattle buyer, Russell Walker, about order buying cattle for IBP. Walker refused Heller's offer to order buy, i. e., to purchase upon specific order of the packing firm with compensation on a commission basis. However, he indicated that he would buy from Heller at "dressed beef" prices, i. e. the price per pound after slaughter based upon the carcass weight.

In 1968 Heller registered with the Packers & Stockyards Administration of the United States Department of Agriculture and posted the requisite cash bond as security for the payment of the cattle that he bought.

Although IBP procured most of its cattle through salaried cattle buyers (covered by IBP's blanket Packers & Stockyards bond) and paid the seller with its own checks, IBP also bought cattle from independent dealers and through order buyers.

In 1968, IBP, having no salaried cattle buyer on the South Plains (Eastern New Mexico and the Panhandle of Texas) where Heller operated, entered into a course of dealing with Heller whereby Russell Walker regularly offered to purchase cattle from him. Walker provided Heller with information concerning the maximum number of cattle of the type and weights desired by IBP, the price IBP would pay per pound for dressed beef, the date the cattle were to be delivered and the length of time the offer would remain open. Heller usually accepted all or a portion of the offer, either at that time or at a later time before the offer lapsed.

Heller bought cattle on a live weight basis. He paid for the cattle with his personal checks. He normally dealt with the custom feed yard manager, or in some instances directly with the owner of the cattle on feed. Once an agreement was reached, Heller had ten days to take delivery or the cattle would be placed back on feed for his account.

Heller sold cattle to IBP on a dressed weight basis. Once the dressed weight was determined, IBP paid Heller by check. If requested, IBP would advance Heller a portion of the estimated dressed weight of the cattle after they were in its possession. The partial payments were made by wire transfer from IBP's bank to Heller's bank.

The cattle which Heller sold to IBP were ordinarily transported by railcars leased by Heller and loaded at special sidings located at Amarillo and at the Hereford Feed Yard. Heller paid all freight charges stemming from these shipments and bore the risk of loss resulting from the death of cattle prior to delivery.

Heller was free to—and did—sell cattle to packers other than IBP at whatever prices he could negotiate. As time passed, the volume of cattle supplied by Heller to

IBP increased until, in late 1973 and January, 1974, Heller was shipping as many of 500 head to Emporia on some days.

On January 29, 1974, Heller agreed to buy 720 head of cattle owned by R&L and on feed at United Beef Producers' feed yard near Hereford, Texas. The sale was approved by R&L partners Rufenacht and Lewis.

Heller took delivery of the cattle on four separate days beginning on January 30, 1974 and concluding on February 8, 1974. On each occasion United Beef Producers prepared an invoice showing Heller as the buyer and R&L as the owner. No reference was made to IBP.

Heller had the cattle transported by truck from the feed yard to a railroad siding, where the cattle were loaded onto railcars and shipped to IBP at Emporia. Upon receiving each of the first three shipments, IBP wired partial payment to Heller's bank. Once IBP determined the dressed weight of the cattle in each shipment, checks were forwarded to Heller's account. With regard to the fourth shipment, IBP made no partial payment, but made payment in full to Heller's trustee in bankruptcy.

Both United Beef Producers and R&L expected Heller to pay for the cattle with his personal checks. When no checks were received after Heller took delivery of the final shipment of cattle Lewis of R&L asked the feed yard manager to investigate the matter. Following a meeting between the manager and Heller, payment for the first two shipments of cattle was received on February 9, 1974, in the form of two checks made payable to United Beef Producers.

On February 11, 1974, at the feed yard manager's request, Heller voided the two checks payable to United Beef Producers and reissued them in the names of the owners. Heller also issued checks for the last two deliveries of cattle. The feed lot manager transmitted these four checks to R&L, however, none were paid.

Shortly before Sunday, January 27, 1974, Heller purchased 137 head of cattle owned by Prochemco Cattle Partners. These cattle were on feed at Prochemco's Hereford Feed Yard. The transaction was negotiated between Heller and the feed yard manager Richard Crider. Heller did not represent to Crider that he was acting on behalf of IBP.

Heller took delivery of the cattle on January 27, at which time the cattle were weighed and a regular invoice prepared by the feed yard personnel reflecting the purchase price. The feed yard scale tickets and the invoice were the only documentation issued in connection with the sale and delivery of the cattle. The invoice showed Prochemco Cattle Partners as the seller and Heller as the buyer. IBP was mentioned in the "Remarks" section of the invoice wherein there was a notation that the cattle had been "shipped to IBP at Emporia, Kansas, via the railroad." This was known as the result of the fact that the cattle were loaded onto Heller's railcars at the feed yard siding.

The cattle purchased from Prochemco Cattle Partners arrived at Emporia on January 28 and were killed that date. Upon receiving the cattle IBP wired $55,000 partial payment for each of the two carloads of cattle which had been made up of the 137 head purchased from Prochemco Cattle Partners and 104 head from other owners. The following day IBP mailed two checks to Heller's bank for the balance due based upon the dressed weight of the cattle. The checks were for $10,271.65 and $9,777.73 and they were deposited into Heller's account on January 31, 1974.

The invoice from the feed yard directed Heller to mail his check for the cattle to Prochemco's Amarillo, Texas office. When no check had arrived from Heller by Friday, February 8, 1974, a Prochemco clerk called the Hereford Feed Yard to have Mr. Crider follow up on the matter. Subsequently, Heller's check was received by Prochemco and deposited on February 19, 1974. It was returned unpaid on February 28, 1974.

On February 19, 1974, certain of Heller's feed yard creditors filed an involuntary petition in bankruptcy. Heller consented to

adjudication and was later adjudged bankrupt.

Plaintiffs in these consolidated lawsuits thereafter filed claims against Heller's Packers & Stockyards bond and his bankrupt estate and recovered partial payment of their respective claims. These lawsuits were instituted seeking recovery of the balances still owing.

## THE APPLICABILITY OF COLLATERAL ESTOPPEL

Heller's insolvency gave rise to other lawsuits by parties who, like Prochemco Cattle Partners and R&L, sold cattle to Heller which ultimately became the property of IBP. Two such cases were filed by Valley View Cattle Company and Lubbock Feed Lots, Inc. against IBP. They were tried to separate juries and resulted in verdicts for plaintiffs based upon the finding that, with respect to the transactions at issue therein, Heller had an agency relationship with IBP. Both cases were affirmed on appeal to this Court. *Valley View Cattle Co. v. Iowa Beef Processors*, 548 F.2d 1219 (5th Cir., 1977) *cert. den'd* 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250 (5th Cir., 1980). (Hereinafter *Valley View* and *Lubbock Feed Lots*).

Appellants here take the position that the trial court erred in failing to hold that, by virtue of the result in *Valley View* and *Lubbock Feed Lots*, IBP was estopped from denying an agency relationship with Heller in the transactions forming the subject matter of these two lawsuits. We disagree.

■ Federal procedure governs the applicability of the doctrine of collateral estoppel in these diversity actions. *Stovall v. Price Waterhouse Co.*, 652 F.2d 537 (5th Cir., 1981); *Southern Pacific Transportation Co. v. Smith Material Corp.*, 616 F.2d 111 (5th Cir., 1980) *reh. den'd* 621 F.2d 440 (1980); *Johnson v. United States*, 576 F.2d 606 (5th

Cir., 1978); *Willis v. Fournier*, 418 F.Supp. 265 (M.D.Ga., 1976) *aff'd without published opinion* 537 F.2d 1142 (5th Cir., 1976).

■ Applicability of collateral estoppel is conditioned upon three requirements: (1) that the issue to be concluded be identical to that involved in the prior action; (2) that in the prior action the issue was fully litigated; and (3) that the determination of the issue was necessary and essential to the resulting judgment in the prior action. *Johnson v. United States*, supra, at p. 615; *In the Matter of Merrill*, 594 F.2d 1064 (5th Cir., 1979).

■ The estoppel urged here is offensive collateral estoppel whereby a plaintiff seeks to estop a defendant from relitigating issues which a defendant previously litigated and lost against another plaintiff. Use of offensive collateral estoppel was approved in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). However, the decision as to the applicability of the doctrine is within the discretion of the trial judge who should not allow its use when to do so would be unfair to the defendant. *Parklane, supra*. As noted in *Johnson v. United States, supra* :

"... the offensive use of collateral estoppel calls for the courts to use special care in examining the circumstances to ascertain that the defendant has in fact had a full and fair opportunity to litigate and that preclusion will not lead to unjust results. [citations omitted]"
576 F.2d at 614.

The Court below carefully analyzed *Valley View* and *Lubbock Feed Lots* and determined that collateral estoppel was not applicable for the reason that the issues determined in those cases were not identical to the ones at bar and because application would be unfair to defendant IBP.[1] We find no error in such conclusion.

■ Collateral estoppel is appropriate only when the identical issue has been fully

---

1. The Memorandum Opinion of the trial court states in pertinent part:

An examination of the Fifth Circuit opinion in *Valley View* reveals that the basis of the affirmance was not the existence of an express agreement of agency between IBP and

Heller, but rather the presence of evidence from which a jury could imply an agency relationship. The Court thus concluded that, "there was sufficient evidence in support of the jury's finding that Heller purchased the

litigated in a prior case. In each of the lawsuits pertinent to our consideration, plaintiff made or makes the allegation that Heller had an agency relationship with IBP. However, each claim is referable to a separate and distinct cattle transaction. There is no doubt that the transactions involving Valley View Cattle Company, Lubbock Feed Lots, Prochemco Cattle Partners and R&L were similar in nature and close in time. But they were not identical.[2] The fact that Heller acted in a given manner with regard to any given seller does not necessarily dictate that he acted in the

selfsame manner with another. Certainly the fact that Heller's actions were such as to allow him to be deemed an agent of IBP in some cases may serve as the basis of argument in support of the conclusion that he so acted in others. However, the holdings in *Valley View* and *Lubbock Feed Lots* are not dispositive of Heller's status in the Prochemco Cattle Partners sale of on or before January 27, 1974, or in the R&L transaction of January 29, 1974. The juries in *Valley View* and *Lubbock Feed Lots* made no finding that during any given span of time Heller was acting exclusively as

cattle in question as the agent of IBP." [citation omitted]

Both the jury's answer to the special interrogatories on actual agency and the Fifth Circuit affirmance of that answer are limited to the transaction between Valley View Cattle Company and Louie Heller. Whether an agency relationship could also be implied in the case at bar has not been resolved by the *Valley View* finding. The Court concludes that the actual agency issue resolved in *Valley View* is not identical to the issue presented in this case.

The Court further finds that the issues submitted by the *Valley View* court on the theory of apparent authority are not identical to the issues presented in this case. An essential element of this theory of recovery is that plaintiff rely upon the apparent authority of the alleged agent to his prejudice. *See, Southwest Title Insurance Company v. Northland Building Corporation*, 552 S.W.2d 425, 428 (Tex., 1977). Neither Prochemco Cattle Partners nor R & L Cattle Company was a party or in privity with a party, in the *Valley View* case. Thus, the jury finding that the conduct of Heller and IBP led Valley View to reasonably believe Heller was the agent of IBP is necessarily limited to that decision.

.    .    .    .    .

The Court is also of the opinion that the application of the doctrine of collateral estoppel to the present case would be unfair to the defendant. The *Valley View* record is not before the Court. Yet it is apparent from the Fifth Circuit opinion that the agency relationship found to exist in *Valley View* was implied from the circumstances surrounding that particular transaction. To apply the doctrine in the present suit would deprive defendant of the right to present evidence concerning the transactions now in question which would not have been admissible in the Valley View litigation.

.    .    .    .    .

The Court, applying the same analysis used in discussion of the *Valley View* judgment, finds that the actual agency issue decided in *Lubbock Feed Lots* is not identical to the agency issue presented in the case at bar. The Court further finds that it would be unfair to defendant to apply the doctrine of collateral estoppel with regard to the actual agency issue. Finally, the apparent agency findings in *Lubbock Feed Lots* are necessarily limited to that decision.

2. Comparison of cases in which collateral estoppel has been held to apply with the instant ones serves to further illuminate the absence of an identity of issues. In *Parklane, supra* a single proxy statement was at issue. The statement has been held to be false and misleading in a prior action filed by the Securities and Exchange Commission. Thereafter, defendant was held estopped from relitigating the legality of the statement in a stockholder's class action challenging it. *Johnson v. United States, supra* was a suit by the widow of an individual killed in a shooting incident which allegedly arose out of the negligence of certain army personnel. There the United States was held estopped from denying negligence because it had previously been found in a suit by the widow of another individual killed in the same shooting. In *Bank of Heflin v. Landmark Inns of America*, 604 F.2d 354 (5th Cir., 1979) suit was filed by the plaintiff bank against a guarantor of a note who was held estopped from denying indebtedness under the guarantee because he had previously obtained judgment in his favor as against a third party for the same indebtedness subject of the guarantee, and had previously been held collaterally estoppel from making such denial in a suit on the guarantee by another bank.

In each instance estoppel applies there is an actual identity of issues—the legality of one proxy statement, the negligence arising from one incident, the execution of one guarantee—as opposed to the cases at bar which involve separate albeit similar sales of cattle.

agent of IBP. Those juries were asked to and did determine only Heller's status with regard to the particular transaction before them. Our affirmances relate solely to the sufficiency of the evidence in support of the jury verdicts as to those two transactions. Prior to trial of these matters below no trier of fact had ever addressed the precise questions at issue herein. Collateral estoppel is unwarranted under the circumstances here present and application of the doctrine, as recognized by the trial court, would be unfair to defendant.

## THE HOLDING OF THE TRIAL COURT

■ Findings of fact are not to be set aside unless clearly erroneous. F.R.C.P. 52(a). Review of the record in these cases reveals the factual findings of the trial court to be amply supported by the evidence.

If findings of fact are not clearly erroneous, the only issue for determination on appeal is whether the legal conclusion drawn from those facts is correct. *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1322 (5th Cir., 1980) *cert. den'd* 449 U.S. 1015, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). We have previously set out the elements of actual and implied agency under Texas law in our decision in *Valley View.*[3] Applying those legal principles to the instant transactions, we conclude

that there was no error in the trial court's conclusion that, with respect to the sales to Heller by Prochemco Cattle Partners and R&L, Heller was not acting as the agent of IBP.

We are further of the opinion that the Court's conclusion on the issue of conversion was not erroneous.

AFFIRMED.

---

**3.** "Under Texas law, 'the relation of agency is a consensual relation existing between two persons, by virtue of which one of them is to act for and in behalf of the other and subject to his control.' *Sorenson v. Shupe Bros. Co.*, 517 S.W.2d 861, 864 (Tex.Civ.App., 1974) *quoting, Roper v. Compania De Perforaciones Y Servi- .cio, S.A.*, 315 S.W.2d 30, 38 (Tex.Civ.App., 1958) and *Bertrand v. Mutual Motor Co.*, 38 S.W.2d 417, 418 (Tex.Civ.App., 1931). The relationship of agent and principal is created either by express or implied contract or by operation of law. *Green v. Hannon*, 369 S.W.2d 853, 856 (Tex.Civ.App., 1963). Thus, the existence of an agency relationship may be implied from the conduct of the parties. *Panhandle Steel Erectors, Inc. v. Whitlow*, 359 S.W.2d 146, 149 (Tex.Civ.App., 1962).

The Texas courts have adopted Restatement (Second) of Agency § 14K (1957):
Agent or Supplier
One who contracts to acquire property from a third person and convey it to another is the agent of the other *only if it is agreed that he*

*is to act primarily for the benefit of the other and not for himself.* (Emphasis added).
*See, American Employers Insurance v. Kilgore*, 412 S.W.2d 67, 69 (Tex.Civ.App., 1967). More particularly, the court in *Kilgore* quoted from and applied the factors for determining the existence of agency set out in the comments to § 14K as follows:
Factors indicating that the one who is to acquire property and transfer it to the other is selling to, and not acting as the agent for, the other are: (1) that he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer (3) That he has an independent business in buying and selling similar property.
Restatement (Second) of Agency § 14K, Comment, at 75–76 (1957); *Kilgore*, 412 S.W.2d at 69." *Valley View Cattle Co. v. Iowa Beef Processors*, 548 F.2d at 1221.