· Dr. Emsley A. DAVIS,
Plaintiff-Appellant,

v.

WEST COMMUNITY HOSPITAL,
Defendant-Appellee.

No. 84–5008.

United States Court of Appeals,
Fifth Circuit.

April 7, 1986.

Rehearing and Rehearing En Banc
Denied May 13, 1986.

LaNelle L. McNamara, McNamara & McNamara, Waco, Tex., for plaintiff-appellant.

W.V. Dunnam, Jr., Dunnam, Dunnam, Horner & Meyer, Waco, Tex., for defendant-appellee.

Before GEE, RUBIN and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Dr. Emsley A. Davis, a black physician, had his staff privileges terminated at West Community Hospital (West). This precipitated a suit by Davis against West and others [1] in which Davis initially sought recovery under 42 U.S.C. § 1981 and Texas tort law. Dr. Davis amended his suit approximately two months before trial and added a claim under Title VII of the Civil Rights Act. Because of the recent filing of the Title VII claim, it was severed and the remaining issues proceeded to trial before a jury. The district court entered a judgment on the jury verdict rendered in favor of Davis following that jury trial and that judgment was appealed to this court. Our decision on that appeal (*Davis I*), is reported at 755 F.2d 455 (1985). Following the jury trial, a bench trial was held on plaintiff's Title VII claim against West. The court dismissed that claim on jurisdictional grounds and alternatively on grounds that West had a legitimate, nondiscriminatory reason to terminate Davis' staff privileges. Davis appeals that adverse decision on his Title VII claim. We conclude that the district court erred in deciding it had no jurisdiction over the Title VII claim but we affirm the district court's judgment on the merits.

I.

Dr. Davis, a general surgeon, was granted staff privileges at West in July 1978. In 1981, Dr. Davis' staff privileges were summarily suspended on grounds that his performance as a surgeon at the hospital was inadequate and substandard. This suspension was based on the alleged improper treatment of eighteen named patients. Four days after the suspension, Dr. Davis' staff privileges were reinstated but proceedings were commenced under the hospital's by-laws to permanently terminate those privileges. At the request of West, a team of surgeons selected by the Texas Medical Association (TMA) reviewed the eighteen patient records which formed the basis for Davis' earlier suspension. Dr. Davis complained about the quality of the performance of two white surgeons on the West staff and the TMA team also re-

---

**1.** In addition to West, Davis named the following individuals as defendants in the § 1981 and Texas tort case: Dr. Robert W. Shirey, Chief of Staff at West; Dr. William G. Manax, Chief of Surgery at West; B.J. Neeley, West's Administrator; Harvey Kelly, West's board Chairman; Jack Kirk, anesthetist at West; and Sue Pescaia, a West board member. West was the only defendant named in the Title VII count.

viewed selected records of the other surgeons on the staff at West. Following this review, the TMA team gave Dr. Davis a negative evaluation; they criticized him for: 1) performing surgery on patients who were poor surgical risks; 2) failing to obtain adequate physical examinations to evaluate whether surgery should be performed; 3) exercising poor judgment in deciding to perform surgery; and 4) performing an excessive number of multiple surgeries on patients who were unable to endure prolonged operations. The evaluations of the other surgeons' performance drew no significant criticism.

A hearing before a panel appointed by the West board was held in which Dr. Davis' treatment of the eighteen patients in question was the subject of detailed testimony. Two other surgeons on the West staff, Drs. Shirey and Manax, testified why they considered Dr. Davis' treatment of each of the eighteen patients substandard. Dr. Davis gave his explanation for his treatment and called as a witness Dr. Tabb, who generally supported Dr. Davis' testimony. In January 1982, two months after this hearing, West's board permanently suspended Dr. Davis' staff privileges at the hospital.

The medical testimony elicited before the board's hearing panel was introduced in the district court and constituted a major part of the medical testimony adduced in the district court. Dr. Davis testified at the bench trial and adduced other evidence designed to show that his performance as a surgeon at West was not substandard but rather met or exceeded expected medical standards. Davis also offered statistical evidence through the testimony of Dr. Martin Shapiro which was designed to show that Dr. Davis' performance was as good or better than the white surgeons who enjoyed staff privileges at West.

The district court dismissed Davis' Title VII suit first on grounds that the court lacked jurisdiction because the defendant did not employ the requisite number of employees required under Title VII. Alternatively, the court dismissed the case on the merits, holding that although plaintiff had established a prima facie case of disparate treatment, the employer carried its burden of establishing a legitimate basis for termination of Davis' staff privileges and the plaintiff failed to establish that the reason given by the employer for the termination was pretextual.

Appellant argues that the district court erred by: (1) dismissing the case on jurisdictional grounds; (2) failing to give preclusive effect to certain findings of the jury in *Davis I;* (3) using an incorrect standard to determine that West rebutted appellant's prima facie case; (4) holding that appellant failed to prove intentional discrimination; and (5) failing to allow amendment of the complaint to add additional defendants.

## II.

### A.

■ We disagree with the determination of the district court that it had no jurisdiction in this case. The district court found that jurisdiction had not been established because Davis failed to prove that West had fifteen or more employees each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 U.S.C. § 2000e(b). We have reviewed the hospital records of the eighteen surgical patients of Dr. Davis referred to above. From our examination of patient John Higgins' medical file, we identified fifteen individuals employed as nurses at West between June 28, 1980 and July 25, 1980. The medical file of patient Johnnie Ruzicka reflects that these same nurses were employed at West between January 1, 1981 and February 1, 1981. In the absence of contrary evidence, it is reasonable to infer that these fifteen nurses were employed continuously during the five month period between July 1980 and January 1981. It is also reasonable to infer from this evidence that technicians, orderlies and other support personnel were in the employ of West during the requisite period. Because the record reveals that West employed more than the number of employees

required by the act, the district court's conclusion that it lacked subject matter jurisdiction is erroneous.

### B.

In *Davis I* the jury found that defendants Manax, Shirey, Kelly and Neely violated Davis' right to equal protection of the law through acts motivated by racial considerations.[2] Appellant contends that West was precluded by the earlier judgment from relitigating the issue of discrimination in this Title VII action.

The district court has broad discretion to determine whether offensive use of collateral estoppel is appropriate. *Nations v. Sun Oil Co.*, 705 F.2d 742, 744 (5th Cir.), *cert. denied*, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983). Offensive collateral estoppel should be invoked to preclude litigation of an issue only if the party against whom collateral estoppel is urged has had a full and fair opportunity to litigate the identical issue in the earlier case. *Rufenacht v. Iowa Beef Processors, Inc.*, 656 F.2d 198, 202–03 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982).

The ultimate issue in this Title VII case is whether West terminated appellant's surgical privileges because he is black. Harvey Kelly was the only member of the six-member board who was found by the jury to have discriminated against Davis because of his race. Neither the board as a whole nor the remaining five board members have had an opportunity to litigate the question of whether they were motivated by race in discharging Davis.

Davis' equal protection claims against Manax, Shirey, Kelly and Neely in *Davis I* included complaints of discrimination not necessarily related to the termination of his staff privileges. For example, Davis offered evidence at trial concerning racial slurs made by Shirey and anonymous letters sent to his patients accusing him of being a "butcher." The jury did not disclose whether its finding of discrimination against these individuals was related to Davis' discharge or in some other connection; consequently, the district court may have considered it uncertain that the issue decided by the jury was identical to the issue presented in the Title VII case. The failure of the jury to award damages to Davis on the equal protection violation supports the view that the discrimination the jury found in *Davis I* was unrelated to his termination.

The fact that the trial of this Title VII action was completed before Davis urged the application of collateral estoppel also mitigates against application of the doctrine. "Collateral estoppel ... has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Appellant first urged the district court to apply collateral estoppel in this case in a post-trial motion filed after the Title VII case had been tried and after the district court ruled against Davis. Use of collateral estoppel at this stage of the proceedings would not have furthered one of the important underlying purposes of this doctrine: promotion of judicial economy. Under these circumstances, we conclude that the district court did not abuse its discretion in declining to apply offensive collateral estoppel.

On a related issue, appellant contends that he was erroneously denied a jury trial on his Title VII case when the district court severed the Title VII case. The law is settled that the parties are not entitled to a trial by jury in a Title VII case where the relief sought is back pay. "The demand for back pay is not in the nature of a claim for damages, but rather is an integral part of the statutory equitable remedy, to be determined through the exercise of the

---

**2.** The jury answered the following interrogatory affirmatively as to Manax, Shirey, Kelly, and Neely: "Do you find that any actions taken against Dr. Davis were made in violation of his right to equal protection (that is, that they were primarily motivated by racial considerations)?"

court's discretion, and not by a jury." *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1125 (5th Cir.1969); *see Roscello v. Southwest Airlines Co.,* 726 F.2d 217, 221 (5th Cir.1984); *see also Harkless v. Sweeny Independent School District,* 427 F.2d 319, 323–24 (5th Cir.1970), *cert. denied,* 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971); *Sullivan v. School Board of Pinellas County,* 773 F.2d 1182, 1187–88 (11th Cir.1985).

■ We need not decide whether Davis would have been entitled to a jury trial on this Title VII claim had it been tried with the section 1981 and state law claims. Davis added the Title VII claim by amendment shortly before trial. The district court did not abuse its discretion in severing the new claim, which had not been prepared for trial. Because the Title VII case was properly severed and tried alone, Davis was not entitled to a jury.

### C.

On the merits the district court, citing *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), held that: 1) plaintiff established a prima facie case of discriminatory discharge; 2) defendant established a reasonable basis for the termination; and 3) plaintiff failed to establish that the reason advanced for the termination was pretextual.

■ Appellant argues first that the district court applied an improper standard in analyzing the second step of the *McDonnell* test. The district court stated that "the defendant has established a reasonable, articulable basis for suspension." The plaintiff complains that the district court did not use the precise language of *McDonnell* which required showing a "legitimate nondiscriminatory" reason for suspension.

Davis' argument is unpersuasive. The language used by the district court is very close to the following language found in *McDonnell*:

The burden must then shift to the employer to articulate some legitimate, non-

discriminatory reason for the employee's rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire.

411 U.S. at 802–03, 93 S.Ct. at 1824.

Also, the district court expressly relied on *McDonnell* and articulated a nondiscriminatory reason for the termination—incompetent medical treatment.

■ Appellant next argues that the factual findings in support of steps 2 and 3 of the court's holding are clearly erroneous. Broadly stated, Davis argues that the finding that West terminated Davis for performing substandard work rather than for a racially discriminatory reason is clearly erroneous. This contention requires a detailed review of the record.

The team of outside physicians selected by TMA submitted a report following their review of the medical records of eighteen of Dr. Davis' patients. The report stated in part that:

Dr. Emsley A. Davis performed operations upon many elderly, obese or otherwise poor risk patients. In some patients, preoperative evaluation, consultations and preparation for surgery apparently was inadequate. The documented indications for the surgery prescribed for some of these patients reflected poor judgment. Several of the operations were excessively prolonged and complicated by multiple procedures. There appeared to be an unusual incidence of complications with increased morbidity and mortality.

Dr. Robert W. Shirey, who was chief of the medical staff at West, elaborated on these summary conclusions. Dr. Shirey considered each of the eighteen patients whose records had been reviewed by the TMA team and gave a detailed analysis of the respects in which Dr. Davis' treatment of each patient was substandard. Without reviewing Dr. Shirey's testimony on each patient, his criticisms of substandard care by Dr. Davis can be grouped into several areas. He criticized Dr. Davis most frequently for performing surgery on elderly

nursing home patients with a host of physical problems that made them extremely poor surgical risks. Some of these problems included heart disease, lung disease, diabetes and severe obesity. He contended that surgery should never have been considered in a number of these patients and in others more conservative, palliative measures should have been attempted before life threatening surgery was attempted. Dr. Shirey testified that in most of the eighteen cases Dr. Davis should have anticipated that if the patients survived the ordeal of major surgery it was likely to hasten their death; he emphasized that the surgery performed by Dr. Davis on many of these elderly, diseased patients was not essential as a life-saving measure and the risk of surgery was not warranted. In support of this opinion, he pointed out that eight of the eighteen patients either died on the operating table or died within a few weeks of the surgery. Dr. Shirey also complained generally about Dr. Davis' failure to order adequate pre-surgical workups designed to enable the surgeon to make a reasoned evaluation of the need for surgery and the patient's ability to tolerate it. This included complaints of failure to obtain adequate medical histories, inadequate physical examination of the relevant body systems, inadequate diagnostic tests and failure to consult with other physicians before deciding to operate.

Dr. Shirey also complained of the nature of specific surgical procedures performed by Davis and the method he chose to use in performing those procedures. He testified that Dr. Davis performed at least one obsolete, radical surgery for pancreatic cancer that was known to have little chance for success. The radical surgery Dr. Davis performed was a long, difficult operation whereas the recommended procedure had a greater chance of success and was much easier for the patient to endure. He also complained of one case in which Dr. Davis failed to properly drain a surgical site which resulted in infection. Dr. Shirey also recited several multiple operative procedures Dr. Davis performed on elderly patients which were, in his view, unnecessary

and also increased the length and difficulty of the surgery.

Dr. William G. Manax, who was also a surgeon on the staff at West Community Hospital, gave testimony that generally supported that of Dr. Shirey. Jack Kirk, an anesthetist who administered the anesthesia to several of Dr. Davis' patients, testified that he refused on several occasions to administer anesthesia to Dr. Davis' patients because they were in his view such poor surgical risks. Dr. Shirey testified that he received several calls from anesthetists "at all hours of the day and night" protesting Dr. Davis' order to administer anesthesia to diseased patients who had little chance of surviving surgery.

Dr. Davis testified before the hearing panel and at trial and disputed Dr. Shirey's testimony and offered his explanation for performing surgery on the eighteen patients under the existing conditions. Dr. Kenneth S. Tabb, a general surgeon, was called by Dr. Davis and generally supported Dr. Davis' view of the propriety of his treatment. Two of the general medical practitioners who referred surgical patients to Dr. Davis testified with respect to individual cases and generally supported Dr. Davis' testimony.

At the trial, Dr. Davis also called Dr. Martin M. Shapiro, who testified in some detail about a statistical study he performed. The statistical study was based on information isolated and recorded from the medical records of all surgical patients of Drs. Davis, Shirey and Manax, from the time Dr. Davis attained staff privileges until his termination. The facts which were isolated from the medical records include the patient's age, the number of procedures performed in each operation, whether infection followed the surgery, whether abnormal tissue was found, and whether the gastrointestinal tract was invaded. After isolating the above facts, the information was collated and Dr. Shapiro reached the following conclusions: 1) Dr. Davis performed multiple procedures in a single operation no more often than his colleagues; 2) Drs. Shirey and Manax performed sur-

gery on patients of advanced years as often as Dr. Davis; 3) the infection rate following surgery by Dr. Davis was no higher than that for his colleagues; and 4) the pathologist found that Dr. Davis removed diseased tissue more often than his colleagues, indicating that Dr. Davis did no more "unnecessary surgery" than the two white surgeons on West's staff.

We are persuaded that the testimony of Dr. Shirey, Dr. Manax and the anesthetist, Mr. Kirk, as to the particular inadequate treatment rendered by Dr. Davis in the eighteen cases under review provides substantial evidence to support the district court's conclusion that West was justified in terminating Davis from its staff.

The statistical evidence is unpersuasive in rebutting the complaints against Dr. Davis. Many of the specific complaints of inadequate treatment by Dr. Davis in particular cases were not isolated and considered in the statistical study. Some of the specific complaints that were not considered include: a failure to obtain adequate medical histories and failure to secure adequate physical examination and other pre-surgical information; failure to give adequate consideration to increased surgical risk caused by unrelated severe physical ailments; unwillingness to attempt conservative or palliative non-surgical measures before performing surgery; and performance of obsolete surgery more radical and severe than ordinarily performed. We have carefully considered the statistical evidence offered by the plaintiff and conclude that it is simply not meaningful in resolving the issues that were presented to the court. The fact that the overall age of the white surgeons' patients

was essentially the same as the age of Dr. Davis' patients has little or no probative value in determining whether the white surgeons applied the same criteria as Dr. Davis in determining whether to operate on a *particular* elderly patient. A similar observation can be made about the other factors gleaned from the medical records of the physicians and compared in isolation from each other. West contended that Dr. Davis performed substandard work on eighteen *specific* surgical patients. West's complaints were leveled at Dr. Davis' decisions to operate or the nature of his work based on a peculiar combination of factors in each of the eighteen cases. It is this critical combination of factors in each individual case that is not addressed by the statistical evidence and which renders that evidence unpersuasive.[3]

The Supreme Court has cautioned us about the indiscriminate use of statistics:

[T]hey come in infinite variety, and like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977).

In *Pouncy v. Prudential Insurance Co.,* 668 F.2d 795, 802 (5th Cir.1982), we noted: "Statistical evidence, however, must be meaningful. 'Because of the significant role that statistics can play in discrimination cases and of their inherently slippery nature, it is imperative that they be used properly.'"

Appellant contends that the district court erred in not considering his statistical

---

3. For example, one of the patients Dr. Shirey contended Dr. Davis should not have performed surgery was Ms. Dyer, who Dr. Davis diagnosed as having a liver ailment. Dr. Shirey described her preoperative physical condition as follows: "Here is a woman, fifty-three years of age, had a pacemaker, in congestive heart failure, she's got a belly full of fluid with a big liver because of congestive heart failure and he [Dr. Davis] says because of the weight loss which of course is characteristic of diabetes Dr. Davis performed an exploratory abdominal procedure to view

her liver and obtain a biopsy. The patient died on the operating table."

Dr. Shirey criticized the decision to operate for several reasons: Ms. Dyer had several severe physical ailments which made her a poor surgical risk; he did not attempt to reduce the heart congestion so that her chances of survival were improved; he did an open abdominal procedure instead of using a needle to obtain a liver biopsy; and he did not attempt to get her blood sugar under control before operating.

evidence. West, on the other hand, argues that the district court was not required to consider any evidence that was not presented to the board. We agree with appellant that the district court was required to consider its statistical evidence. The case of *Woodbury v. McKinnon*, 447 F.2d 839 (5th Cir.1981), relied on by West, is inapposite; in that case we were concerned with whether the employer violated procedural due process rights rather than whether plaintiff was the victim of a discriminatory discharge under Title VII. It is well established that an employee is entitled to have the court consider all relevant evidence—whether or not it was presented to the employer—on the issue of whether the employer's stated grounds for discharge were pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *Minority Employees at NASA v. Beggs*, 723 F.2d 958, 962 (D.C.Cir.1983).

■ The district court admitted the plaintiff's statistical evidence but stated that because the statistical evidence was unavailable to the employer, it "is not beneficial to Plaintiff in this case." It is unclear whether the district court declined to consider the statistical evidence. For the reason noted above, if the district court did not consider the statistical evidence, it erred. But even if the district court did not consider the statistical evidence, we conclude that the evidence is so lacking in probative value that it is unnecessary to remand the case to permit the district court to consider it.

We conclude that the district court's finding that West terminated Dr. Davis' staff privileges for performing inadequate, substandard medical care rather than for a racially motivated reason is supported by substantial evidence.

### D.

■ Davis' Title VII claim was brought only against West. Davis sought to amend his complaint to add as defendants to the Title VII claim the same individual defendants that were named in the section 1981 and Texas tort law claims. The district court denied appellant's motion to amend on grounds that the individuals could not be added as defendants because they had not been named in the EEOC charge.

In *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 647 n. 6 (5th Cir.1974), we declined to decide whether failure to name a party in the EEOC charge precluded a Title VII action against that party and it is unnecessary to decide the question in this case. *See Sedlacek v. Hach*, 752 F.2d 333, 336 (8th Cir.1985); *Arnold v. Consolidated Freight Ways, Inc.*, 399 F.Supp. 76 (S.D.Tex.1975). Even if Davis had been permitted to amend his petition to name the agents and employees of West it would not have affected the outcome of this case. Appellant sought to impose liability against West for the discriminatory acts of West's employees and representatives including the individuals Davis sought to name as defendants. Unfortunately for Davis he did not succeed in this effort. Davis did not seek to allege in the amendment that these individual agents committed discriminatory acts outside the scope of their employment with West; thus an action against the individual employees would have been no more productive than the action against West.

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, dissenting.

Whether Dr. Davis was in fact a good doctor who was the victim of racial discrimination or whether he failed to adhere to proper medical standards and was removed from the hospital staff for good cause, we do not, and may never, know, for we must decide this case only on the basis of what the record shows. Based on that, I would reach a conclusion different from the one my brothers reach. I, therefore, respectfully dissent.

We all agree that the district court erred in dismissing this case for want of jurisdiction and in failing to consider the statistical evidence. Both of these errors result from

an analysis so patently strained and so clearly incorrect as to indicate an attitude that must certainly have influenced the court's findings on other issues. Although we can cure the jurisdictional error, I do not think that we, as an appellate court, can, or should, evaluate de novo the weight of the statistical evidence.[1]

I do not suggest remand, however, because I think that the district court also erred in refusing to apply collateral estoppel. The majority notes that Dr. Davis did not invoke the doctrine until after the trial. He could not have done so earlier for the decision on which he relied had been appealed and had not sooner become final.

Avoiding redundant trials is one, but not the only, reason to preclude relitigation of a decided issue: avoiding an appeal that might otherwise not be taken,[2] and preserving the consistency of the judicial system so that results do not depend on a trier-of-fact lottery are others. For these reasons, the district court should have given preclusive effect to the jury's findings on those issues previously litigated between the same parties.

Although the earlier jury finding did not establish that a majority of the Board discriminated against Dr. Davis, this does not preclude the Hospital's liability, for respondeat superior does apply to Title VII claims of race discrimination.[3] Considering the jury findings, the conclusion that the Hospital did not discriminate against Dr. Davis seems to me clearly erroneous. Dr. Davis argued that the Hospital's Chief of Surgery and Chief of Staff preselected the data presented to the Texas Medical Association to ensure a finding that Davis was incompetent, and the jury found that they were motivated by racial prejudice. The Texas Medical Association finding was the basis for the Board's termination of Dr. Davis's operating privileges. Even though a majority of the Board may not have voted against Dr. Davis because of discriminatory motives, the Hospital cannot avoid liability for the prejudicially motivated acts of its supervisory employees that caused the termination.

Unlike the majority, I draw no inference from the jury's failure to award Dr. Davis damages on his equal protection claim. The jury answered a special interrogatory as follows:

Do you find that any actions taken against Dr. Davis were made in violation of his right to equal protection (that is, that they were primarily motivated by racial considerations)?

Answer "yes" or "no" as to each defendant:

| | |
|---|---|
| Dr. William Manax [Chief of Surgery] | yes |
| Dr. Robert Shirey [Chief of Staff] | yes |
| Harvey Kelly [Chairman of Board] | yes |
| B.J. Neely [Hospital Administrator] | yes |

This explicit finding speaks for itself. The jury may have felt that the $300,000 award it made to Dr. Davis on other issues was ample and so, for reasons sufficient to itself, made no additional award for the equal protection violation.

For these reasons, I respectfully dissent.

---

1. *See Anderson v. City of Bessemer,* — U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

2. ALI, Restatement of Judgments 2d, Introductory Note to § 26.

3. *See, e.g., Calcote v. Texas Educ. Found., Inc.,* 578 F.2d 95, 98 (5th Cir.1978); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir.1977); *cf. Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 1447 n. 7 (5th Cir. 1975).